**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JON MCNAMARA; RICHARD
LANDIN,

       Plaintiffs - Appellants,

v.

PRE-PAID LEGAL SERVICES, INC.,
HARLAND C. STONECIPHER;
RANDY HARP; KATHLEEN S.
PINSON; PETER K. GRUNEBAUM;
DAVID A. SAVULA; DELOITTE &
TOUCHE,

       Defendants - Appellees.

Nos. 02-6110 & 02-6178

**ORDER AND JUDGMENT**[*]

Before **KELLY, LUCERO** and **O'BRIEN**, Circuit Judges.

Lead Plaintiffs Jon McNamara and Richard Landin (Plaintiffs), on behalf of all

people who purchased Pre-Paid Legal Services (Pre-Paid) stock from March 18, 1999,

through May 15, 2001, brought this securities fraud action against Pre-Paid, several of its

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

senior officers and directors, and Deloitte & Touche (Deloitte), Pre-Paid's independent auditor. The district court dismissed Plaintiffs' complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs appeal from the dismissal, arguing the district court erred in concluding: (1) they had not sufficiently alleged scienter, (2) their claims were barred by the statute of limitations and (3) the truth-on-the-market doctrine insulated Defendants from liability. Plaintiffs also assert the district court abused its discretion in dismissing their case with prejudice, rather than providing them an opportunity to amend their complaint to correct its pleading deficiencies. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm, concluding the district court properly dismissed Plaintiffs' complaint with prejudice for failure to adequately plead scienter.[1]

## I. Factual Background

Formed in 1976, Pre-Paid is an Oklahoma corporation which designs, underwrites and markets a variety of legal expense plans, called memberships, across North America.[2] In exchange for a fixed premium, memberships entitle their holders to receive legal

---

[1] The five volume record in this case consists of over 1,800 pages. While each volume contains an index with page numbers for large pleadings such as Pre-Paid Defendants' Motion to Dismiss and Pre-Paid Defendants' Request for Judicial Notice, no page numbers or exhibit numbers are provided for the numerous exhibits which were attached to these pleadings in the district court. The parties' failure to provide such page and/or exhibit numbers has made deciding this case unnecessarily laborious.

[2] Pre-Paid began trading its common stock on the New York Stock Exchange in 1999. Prior to May 19, 1999, it traded its stock on the American Stock Exchange.

services (or reimbursement of legal fees incurred for such services) in a manner similar to medical reimbursement plans or HMO's.[3] Memberships are automatically renewable but may be cancelled at any time for fraud, non-payment of premiums or upon a membership holder's written request.

Pre-Paid markets its memberships through a multi-level marketing program which encourages Pre-Paid's sales associates to sell memberships and recruit new associates. Sales associates are considered independent contractors and are paid by commission.[4] In general, when an associate sells a membership, Pre-Paid advances that associate a commission equal to three years worth of commissions.[5] Pre-Paid recoups these "commission advances" as premiums are collected, usually on a monthly basis.

Should a membership lapse before three years, the associate is obligated to "repay" any unearned portion of the commission advance. To re-capture 50% of any unearned advance, Pre-Paid generates a "charge-back" to the associate's account. This charge-back is immediately deducted from any future commission advances payable to the associate for the sale of new memberships. Pre-Paid recovers the remaining 50% by withholding

---

[3] Pre-Paid has two types of memberships, open-panel and closed-panel. Substantially all of the memberships are closed-panel, which require membership holders to access legal services through a network of independent law firms under contract with Pre-Paid.

[4] Commissions are paid to the selling associate and any associate who directly or indirectly recruited the selling associate.

[5] Associates could choose to receive less than a three-year advance.

3

future commissions due an associate on active/prior memberships.[6] No additional

commission advances are paid to an associate until all previous advances have been

recovered. Pre-Paid carries a reserve for unrecoverable commission advances. Between

1997 and 1999, Pre-Paid increased this reserve from $3.7 million to $4.5 million.

   *A. Reporting of Unearned Commission Advances as Assets*

   Pre-Paid reports quarterly and annually to the Securities and Exchange

Commission (SEC) using Forms 10-Q and 10-K, respectively. In these forms, Pre-Paid

provides its financial statements. These statements are prepared according to Generally

Accepted Accounting Principles (GAAP)[7] and are audited by Pre-Paid's independent

auditor. From September 1994 until August 2001, Deloitte served as Pre-Paid's

---

[6] Pre-Paid did not disclose this additional method of recovering unearned commission advances until 2001. *Compare* Pre-Paid's Form 8-K dated January 25, 2001, at 5 (App. Vol. I at A-216) *and* Pre-Paid's Original Form 10-K for year ending December 31, 2000, at 22 (Supp. App. Vol. I at SA-30) *with* Pre-Paid's Form 10-K for year ending December 31, 1998, at 16 (Supp. App. Vol. II at SA-582) *and* Pre-Paid's Form 10-K for year ending December 31, 1999, at 21 (*Id.* at SA-663).

[7] Generally Accepted Accounting Principles (GAAP) are a body of pronouncements that govern the measurement and reporting of financial information and related disclosure. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n.7 (1984) (defining GAAP as "the conventions, rules, and procedures that define accepted accounting practices"). Traditionally, accounting standards have been set in the private sector, although the SEC has the power to set such standards for publicly traded companies. While the American Institute of Certified Public Accountants (AICPA) has input into such standards, an independent, private body, the Financial Accounting Standards Board, is primarily responsible for setting accounting standards. *Id.* GAAP includes broad pronouncements as well as some very specific rules for certain transactions, and whether a particular method of reporting is consistent with GAAP is often a matter of professional judgment.

independent auditor.

From at least 1995 to 2000, Pre-Paid, based on its theory that it had a right to receive unearned commission advances back from its associates (*i.e.,* a receivable), recorded *unearned* commission advances as assets.[8]  During this same period, Deloitte audited Pre-Paid's financial statements and issued unqualified opinions that they conformed with GAAP and fairly represented Pre-Paid's financial position.

B.  *Pre-Paid's 1995, 1996, 1998 and 1999 Form 10-K's*

In its 1995, 1996, 1998 and 1999 Form 10-K's, Pre-Paid disclosed its commission advance policy and the actions it takes to recoup its commission advances.[9]  It stated that historically it had been able to immediately recover 50% of any unearned commission advance through the use of the charge-back.  However, Pre-Paid warned its commission advance policy exposes it to the risk of uncollectible commission advances.  Pre-Paid also stated one of the major factors affecting its profitability and cash flow was its membership persistency rate, which it represented as its ability to retain a membership once it is written and therefore collect premiums.  Pre-Paid reported its membership

---

[8] In its 1995 and 1996 Form 10-K's, Pre-Paid referred to the unearned portion of commission advances as "Commission advances" on its balance sheet. (App. Vol. II at A–471; Supp. App. Vol. I at SA-423.)  In its 1998 and 1999 Form 10-K's, it referred to it as "Membership commission advances."  (Supp. App. Vol. II at SA-595, SA-676.)  Despite the name assigned, "Commission advances" and "Membership commission advances" represented only the *unearned* portion of commission advances.  It was this unearned portion that Pre-Paid recorded as an asset.

[9] Pre-Paid's 1997 Form 10-K is not in the record.

5

persistency rate was 80.0% for 1995, 74.0% for 1996, 73.8% for 1998 and 73.4% for 1999.  Between 1995 and 1999, Pre-Paid's membership premiums increased from $31.2 million to $157.2 million.  During this same time period, new membership sales rose from 109,922 to 525,352.  Total unearned commission advances also grew each year, increasing from $12.5 million in 1995 to $120.6 million in 1999.  Because Pre-Paid recorded unearned commission advances as assets, as unearned commission advances increased so did Pre-Paid's total assets.  By 1999, Pre-Paid's unearned commission advances represented 62.2% of Pre-Paid's total assets ($193.8 million).

*C. Pre-Paid's January 25, 2001 Form 8-K*

On January 25, 2001, in response to public discussion concerning its accounting treatment of unearned commission advances, Pre-Paid filed a Form 8-K with the SEC "to provide details regarding the accounting treatment of [] commission advances and expenses . . . ."  (R. App. Vol. I at A-213.)  In this Form 8-K, Pre-Paid explained why it believed its treatment of unearned commission advances as assets complied with GAAP.  Specifically, it stated that because its "commission advances relate directly to memberships that represent a future economic benefit (a stream of future cash payments) to be received by [Pre-Paid] as a result of a past transaction (the original membership sale)," its commission advances conformed to GAAP's definition of assets as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."  (*Id.* at A-213-A-214 (quotations omitted).)  Because the key issue with respect to commission advances is recoverability, Pre-Paid then proceeded to

discuss its membership retention rates, its actual commission advances, their recoverability, membership growth and the expected lifetime value of a membership. Notably, Pre-Paid disclosed that one year after purchasing a membership, only 53.37% of membership holders remain as paying customers. After two years, this figure drops to 36.97%.

D. Pre-Paid's Original 2000 Form 10-K

In its original Form 10-K for the year ending December 31, 2000 (filed with the SEC on April 27, 2001), Pre-Paid again reported unearned commission advances as assets, referring to them as "Membership commission advance receivables."[10] (Supp. App. Vol. I at SA-46.) Again, Deloitte issued an unqualified opinion that Pre-Paid's financial statements conformed with GAAP. However, for the first time, Pre-Paid began writing off unearned commission advances of associates who no longer had any active memberships. Also for the first time in a Form 10-K, Pre-Paid reported that two-years after purchasing a membership, only 36.97% of membership holders remain as paying customers. Nevertheless, when compared to 1999, Pre-Paid experienced an increase in membership premiums and new memberships sold. However, it only reported an additional 4,973 new associates and the amount of unearned commission advances grew to $156.1 million, representing 63.1% of its total assets ($247.3 million). It also substantially increased its reserve for uncollectible commission advances, increasing it

---

[10] All of the Form 10-K's filed during the class period (*i.e.*, the Form 10-K's for 1998, 1999, and 2000) were signed by the individual defendants.

7

from $4.5 million to $11.0 million.

*E. SEC Investigation*

In January and May 2001, the SEC's Division of Corporation Finance (Division) reviewed Pre-Paid's Form 10-K's for 1999 and 2000. On May 11, 2001, Pre-Paid received a letter from the Division advising Pre-Paid that its accounting of unearned commission advances as assets violated GAAP. The Division asserted commission advances should be expensed when paid. On May 15, 2001, Pre-Paid announced the Division's decision. Following this announcement, Pre-Paid's stock price dropped from $19 per share to $14.10 per share. On May 16, 2001, Pre-Paid issued a press release, stating it continued to believe its accounting was in compliance with GAAP and announcing its plans to appeal to the SEC's Office of the Chief Accountant (Chief Accountant).

Pre-Paid appealed to the Chief Accountant, who concurred with the Division's decision. On July 25, 2001, Pre-Paid publically announced the Chief Accountant's decision. In this press release, Randy Harp, Pre-Paid's Chief Operating Officer, stated the decision would have a material adverse effect on Pre-Paid's balance sheet but it would not change the cash economics of its business. On July 30, 2001, Pre-Paid decided not to appeal the Chief Accountant's decision and agreed to amend its previously filed SEC reports and restate its financial statements to reflect the SEC's conclusion.

*F. Pre-Paid's Restated Financials*

On February 8, 2002, Pre-Paid filed an amended Form 10-K with the SEC for year

8

ending December 31, 2000, which restated Pre-Paid's financial statements for 1998 through 2000 in accordance with the SEC's ruling. As a result of complying with the SEC's ruling, for the year ending December 31, 2000, Pre-Paid's total assets, liabilities and shareholders' equity were reduced (in that order) from approximately $247 million, $100 million and $147 million to $78 million, $36 million, and $42 million, respectively. For year ending 1999, Pre-Paid's total assets, liabilities and shareholders' equity were reduced from approximately $193 million, $79 million, and $114 million to $58 million, $25 million and $33 million, respectively. The re-stated financial statements for year ending 1998 experienced similar reductions.

Because Deloitte disagreed with the SEC's conclusion, it was unable to render an unqualified opinion with respect to Pre-Paid's restated financials. Thus, Pre-Paid and Deloitte reached a mutual agreement to end their client-auditor relationship. Pre-Paid retained Grant Thornton LLP to audit its restated financial statements. On January 30, 2002, Grant Thornton issued an unqualified opinion that the restated financial statements fairly represented Pre-Paid's financial condition and conformed with GAAP.

## II. Procedural Background

On January 17, 2001, The Wall Street Journal published an article entitled "Pre-Paid Legal Draws Criticism on Accounting for Commissions" in which it discussed the potential problems with Pre-Paid's accounting methodology for unearned commission advances. (R. App. Vol. III at A-729.) It noted Pre-Paid's unearned commission advances were ballooning while its reserve for unrecoverable advances was unchanged at

9

$4.5 million. It also expressed concern over Pre-Paid's ability to recoup unearned commission advances, noting Pre-Paid cannot recoup commission advances if an associate stops selling memberships or does not have any memberships older than three years. Lastly, it stated that over the past five years, Pre-Paid had not written off any commission advances as unrecoverable despite Harp's admission that some commission advances would never be recovered through the use of the charge-back. As a result of this article, Pre-Paid's stock dropped from $22.6875 to $20.875.

Five days later, the first of nineteen complaints was filed in the Western District of Oklahoma against Pre-Paid, Harland C. Stonecipher (Chief Executive Officer and Chairman of the Board), Harp (Chief Operating Officer and Board Director), Kathleen S. Pinson (Chief Accounting Officer and Board Director), Peter K. Grunebaum (Board Director and Chairman of its Audit Committee) and David A. Savula (Board Director) [hereinafter collectively referred to as Pre-Paid Defendants] under the Securities and Exchange Act of 1934 (Exchange Act). On May 15, 2001, the district court consolidated the cases and appointed Jon McNamara, Richard Landin and Bricoleur Capital Management as lead Plaintiffs. On June 14, 2001, the lead Plaintiffs filed a sixty-four page consolidated amended class action complaint (Consolidated Complaint) on behalf of all purchasers of Pre-Paid's common stock from March 18, 1999, through May 15, 2001, (the class period) against Pre-Paid Defendants and Deloitte, who had not been named as a defendant in the individual complaints.

The Consolidated Complaint alleged Pre-Paid Defendants "made false and

10

misleading public statements in order to overstate Pre-Paid's earnings and materially

falsify [its] financial condition in order to artificially inflate the price of Pre-Paid stock"

and Deloitte "knew or recklessly disregarded Pre-Paid's true financial and operating

condition and failed to take steps to fully and fairly disclose them to the public." (R. App.

Vol. I at A-17-A-18.) Count I, alleged against all the defendants, asserted a violation of §

10(b) of the Exchange Act, 15 U.S.C. § 78j(b),[11] and Rule 10b-5 promulgated

thereunder.[12] Count 2, alleged against the individual defendants only, claimed the

---

[11] Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[12] Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

11

individual defendants were "controlling persons" of Pre-Paid and therefore were liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t,[13] for the alleged fraudulent conduct of Pre-Paid.  (App. Vol. I at A-78.)

On July 24, 2001, Pre-Paid Defendants filed a motion to dismiss the Consolidated Complaint arguing Plaintiffs had not and could not plead the requisite scienter.  In the alternative, they asserted the Consolidated Complaint failed because Pre-Paid's accounting methodology was fully disclosed to the market (the truth-on-the market doctrine).  On August 9, 2001, Deloitte also filed a motion to dismiss.  In addition to reiterating Pre-Paid Defendants' lack of scienter argument, Deloitte contended Plaintiffs' action was barred by the statute of limitations.

On March 5, 2002, the district court granted both Pre-Paid Defendants' and Deloitte's motions to dismiss with prejudice and entered judgment accordingly.  On

---

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[13] Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

12

March 25, 2002, the district court issued an Order Nunc Pro Tunc correcting a mistake of fact in its March 5, 2002 order but otherwise leaving its decision intact. On March 29, 2002, Plaintiffs filed a Rule 60(b) Motion, or in the alternative, a Motion for Reconsideration. On April 2, 2002, they filed a notice of appeal, which was amended on April 23, 2002, concerning the court's March 5 and March 25, 2002 orders (Appeal No. 02-6110). On May 20, 2002, the district court concluded Plaintiffs' Rule 60(b) Motion/Motion for Reconsideration was moot in part as its Nunc Pro Tunc Order had corrected Plaintiffs' alleged mistake of fact. It denied the motion in all other respects. On June 5, 2002, Plaintiffs filed a notice of appeal challenging the May 20, 2002 order (Appeal No. 02-6178). Both appeals were consolidated.

On August 9, 2002, Lead Plaintiff Bricoleur Management filed a motion with this Court to dismiss it as an appellant, which was granted. During the course of this appeal, Plaintiffs settled with Deloitte. Consequently, on February 6, 2004, this action was partially remanded to the district court for the limited purpose of reviewing and approving the settlement agreement. On December 10, 2004, the district court approved the settlement. On March 18, 2005, we granted Plaintiffs and Deloitte's stipulation to dismiss with prejudice Deloitte as a party to this appeal. Consequently, only Pre-Paid Defendants remain as appellees.

### III. Discussion

Plaintiffs argue the district court erred in dismissing their Consolidated Complaint because they adequately pled scienter, the complaint was timely and Pre-Paid Defendants

13

cannot rely on the truth-on-the-market doctrine. In the alternative, they contend they should have been afforded an opportunity to amend their complaint to correct any pleading deficiencies.

We review de novo a district court's dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1257 (10th Cir. 2001). In undertaking that review, we accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the non-moving party.[14] *Id*. We review the denial of leave to amend for abuse of discretion. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997). However, where that denial is based on the conclusion that amendment would be futile, we review de novo. *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239 (10th Cir. 2001).

1. Scienter

The elements of a private securities fraud action under § 10(b) and Rule 10b-5 are: (1) the defendant made an untrue or misleading statement or omission of material fact, (2) the statement or omission was made in connection with the purchase or sale of a security,

---

[14] Here, in addition to Plaintiffs' Consolidated Complaint, the district court considered documents referred to in the complaint, in particular Pre-Paid's filings with the SEC. Consideration of such documents was proper because they were central to Plaintiffs' claims and none of the parties disputed their authenticity. *Jacobsen v. Deseret Book, Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *see also Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) (holding such consideration is discretionary). Moreover, such consideration did not require the district court to convert Pre-Paid Defendants' motion to dismiss into one for summary judgment. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997).

(3) the defendant acted with the requisite scienter, (4) the plaintiff relied on the false or misleading statements, and (5) the plaintiff suffered economic loss as a result of his reliance.[15] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). The scienter element requires "a mental state embracing intent to deceive, manipulate, or defraud." *Fleming Cos.*, 264 F.3d at 1258 (quotations omitted). It includes "knowing or intentional misconduct" and recklessness, which is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quotations omitted). However, there are limitations on the recklessness standard. *Id.* For instance, we will not allow allegations of "fraud by hindsight" (*i.e.*, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did") or allegations that the defendant failed to disclose knowledge of material facts without a further showing that the defendant knew withholding such facts would likely mislead investors. *Id.* at 1260 (quotations omitted). Moreover, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim"; such allegations must be "coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors . . . ." *Id.* at 1261.

---

[15] Section 10(b) does not provide for private causes of action; such actions are a judicial creation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 358 n.3 (1991).

15

Prior to 1995, a plaintiff pleading the elements of a securities fraud claim was required to follow Rule 9 of the Federal Rules of Civil Procedure, which requires setting forth fraud allegations with particularity but allows conditions of mind such as malice, intent and knowledge to be averred generally.[16] *Adams*, 340 F.3d at 1095. However, in 1995, in order to curb some of the abuses experienced in private securities lawsuits, Congress enacted the Private Securities Litigation Reform Act (PSLRA).[17] *Id.* at 1095. The PSLRA heightened the pleading standard for the first and third elements. *Id.* at 1095-96. Relevant here is the PSLRA's increased burden of pleading the third element, scienter:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

----

[16] Rule 9(b) provides:

**(b) Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

[17] Examples of abuses the PSLRA sought to eliminate are (1) the routine filing of lawsuits whenever an issuer's stock price experiences a significant change, (2) class action lawyers' manipulation of the clients they represent, (3) abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle, and (4) shareholder derivative actions filed with the hope of winning large attorney fees or private settlements with no intention of benefitting the corporation (*i.e.*, "strike suits"). *Fleming Cos.*, 264 F.3d at 1258-59 & n.16.

15 U.S.C. § 78u-4(b)(2).[18]

To determine whether a plaintiff's complaint meets this heavy burden, we must look to the totality of the plaintiff's allegations. *Adams*, 340 F.3d at 1105; *Fleming Cos.*, 264 F.3d at 1262-63. Allegations of motive and opportunity are relevant in making this determination. *Fleming Cos.*, 264 F.3d at 1262-63. However, such allegations, standing alone, are insufficient. *Id.* In sum, "[w]hen reviewing a plaintiff's allegations of scienter under the PSLRA, a court should [] examine the plaintiff's allegations in their entirety, without regard to whether those allegations fall into defined, formalistic categories such as 'motive and opportunity,' and determine whether the plaintiff['s] allegations, taken as a whole, give rise to a strong inference of scienter." *Id.* at 1263.

To determine whether Plaintiffs adequately pled scienter, we look to the Consolidated Complaint. In it, Plaintiffs allege Pre-Paid Defendants improperly recorded unearned commission advances as assets in violation of GAAP. They claim that by

---

[18] In *Pirraglia v. Novell, Inc.*, we resolved the tension between the PSLRA's strict pleading requirements and Rule 12(b)(6)'s deference to the plaintiff. 339 F.3d 1182, 1187 (10th Cir. 2001). We held that at the Rule 12(b)(6) stage of a securities fraud action, we evaluate the strength of the plaintiff's suggested inference in the context of other reasonable inferences that may be drawn but do not weigh the plaintiff's suggested inference against these other inferences to determine which one will ultimately prevail. *Id.* at 1187-88. In other words, we use other reasonable inferences to determine the strength of the plaintiff's suggested inference, *i.e.*, whether it is a "strong" inference, but not to determine whether plaintiff's suggested inference is the correct one. *Id.* at 1187-88. At the end of the day, "[i]f a plaintiff pleads facts with particularity that, in the overall context of the pleadings, including potentially negative inferences, give rise to a strong inference of scienter, the scienter requirements of the Reform Act is satisfied." *Id.* at 1188.

recording unearned commission advances as assets, Pre-Paid Defendants materially overstated Pre-Paid's financial condition. And, Plaintiffs contend Pre-Paid Defendants used this overstatement to laud Pre-Paid's financial success and artificially inflate Pre-Paid's stock price.

Plaintiffs also claim Pre-Paid Defendants violated GAAP by continuing to report unearned commission advances as assets, even when it was clear they were unrecoverable, due to either a membership lapsing before three years or the associate owing the advance becoming inactive. They assert Pre-Paid Defendants should have written-off these unrecoverable commission advances and by failing to do so, gave investors the false impression that Pre-Paid could recover them under its charge-back policy. They also allege Pre-Paid Defendants misled investors by pooling unrecoverable commission advances with potentially recoverable advances thereby preventing an investor from determining the true extent of Pre-Paid's risk.

Plaintiffs further allege Pre-Paid Defendants misled investors by representing that Pre-Paid's membership persistency rate reflected its ability to retain a membership and therefore receive premiums once a membership was written. They contend Pre-Paid Defendants claimed in their 1998 and 1999 Form 10K's that Pre-Paid's persistency rate was 73.8% and 73.4%, respectively, but until 2001 failed to disclose that only 53.37% of membership holders were still paying one year after purchasing a membership, only 36.97%

18

were still paying after two years[19] and only 28.66% after three years.

Plaintiffs also assert Pre-Paid Defendants misled investors concerning Pre-Paid's ability to recover unearned commission advances from its associates. Specifically, they claim Pre-Paid Defendants failed to disclose: (1) Pre-Paid historically had not attempted to collect unearned commission advances from associates who left the company, (2) Pre-Paid allowed associates to abandon accounts with high unearned commission advances and start a new account without penalty, (3) Pre-Paid's cancellation rates on memberships were increasing, (4) Pre-Paid's membership growth was slowing and (5) an increasing number of associates were not making new sales. Plaintiffs allege that despite knowing these facts (which reduced the likelihood of recovering unearned commission advances), Pre-Paid Defendants did not substantially increase Pre-Paid's reserve for uncollectible commission advances.

As to Pre-Paid Defendants' motive to commit fraud, Plaintiffs allege:

1. Defendants Harp and Pinson had bonus compensation agreements directly tied to meeting certain earnings per share criteria;

2. On November 21, 1997, Pre-Paid established an Associate Investment Stock Club Purchase Plan which was designed to induce its associates to purchase Pre-Paid stock at market price. Pre-Paid acquired the shares to distribute to its associates through this Plan from Defendant Stonecipher's personal holdings. Thus, Defendant Stonecipher established an outlet to regularly dispose of his shares and was motivated to maintain an artificially inflated stock price;

---

[19] On pages twelve and twenty-one of the Consolidated Complaint, Plaintiffs state that less than 47% of membership holders remain as paying customers two years after purchasing a membership. On pages fifteen and twenty-eight, they refer to this figure as 36.97%. The latter figure is consistent with Pre-Paid's own disclosures.

19

3.  Defendant Grunebaum, who was a Director and the Chairman of the Board of Director's Audit Committee, dumped 23,000 shares of his stock between April 24, 2000, and November 28, 2000, reducing his total holdings to only 4,000 shares; and

4.  Defendant Savula, who was a Director and Pre-Paid's most senior sales associate, dumped 15,000 shares (37% of his holdings) on October 23, 2000, obtaining a net profit of over $500,000.

The district court concluded these allegations, taken in their totality, did not raise requisite strong inference of scienter. It concluded Plaintiffs' allegations supported an inference that Pre-Paid Defendants "at least" violated GAAP. (R. App. Vol. III at A-740.) Because GAAP violations alone are insufficient to sustain a securities fraud action, the court next examined Plaintiffs' allegations of Pre-Paid Defendants' motive to commit fraud, finding them lacking. Also compelling to the court was Pre-Paid's repurchase of over two million of its own shares, concluding it is "patently absurd" for a company to fraudulently inflate the price of its stock only to then purchase the stock at such inflated prices without any financial benefit. (*Id.* at A-741.) Lastly, the district court found convincing the fact that Pre-Paid Defendants had operated under what they considered to be a proper interpretation of GAAP for seven years, that they had reported unearned commission advances as assets in Pre-Paid's SEC filings, that they had disclosed in these same filings that they considered their commission advance policy a risk should they not be collected or offset and that when Pre-Paid complied with the SEC's ruling, its after-tax income for 2000 and the first quarter of 2001 was reduced by a mere 8.5%, "hardly a precipitous reduction." (*Id.* at A-743.).[20]

---

[20] In its initial order of dismissal on March 5, 2001, the district court erroneously stated that as a result of the change of accounting for unearned commission advances, Pre-Paid's net income for 2000 and the first quarter of

This case may be a close call, but it is difficult to tell because the complaint is so rich in sweeping, generalized and sometimes conclusory allegations. Pleading precision could have better informed the debate and aided the critical analysis necessary to resolve a motion to dismiss. In the face of a somewhat chaotic complaint the district court understandably cut to the chase. Although the district court listed the numerous alleged GAAP violations, it appears the court distilled the Consolidated Complaint to the single GAAP violation concerning the recording of unearned commission advances as assets. When so limited, the Consolidated Complaint fails to adequately allege scienter because there is no evidence that this alleged GAAP violation was the result of Pre-Paid Defendants' fraudulent intent to mislead investors. The district court noted Pre-Paid's SEC filings[21] disclosed it recorded unearned commission advances as assets on its balance sheets and warned it might not be able to recoup unearned commission advances. If Pre-Paid Defendants intended to deceive investors, it makes little sense for them to overtly disclose their scheme to the SEC and

2001 was only reduced by 8.5%. Pre-Paid Defendants brought this error to the attention of the district court, which in turn acknowledged its error in its March 25, 2001 Order Nunc Pro Tunc, stating this error did not affect its dismissal of Plaintiffs' Consolidated Complaint. In its order denying Plaintiffs' Rule 60(b) Motion/Motion for Reconsideration, the court again emphasized it was aware of the magnitude of Pre-Paid's restatements but still concluded, based on a totality of the circumstances, that Plaintiffs had failed to adequately plead scienter.

[21] We believe the district court gave too much weight to the fact that the SEC never challenged Pre-Paid's accounting methodology for seven years. While Pre-Paid did disclose its accounting of unearned commission advances in its SEC filings, there is no indication in the record concerning the frequency or thoroughness of the SEC's review of a corporation's quarterly and annual reports. Absent such information, the SEC's silence for seven years may merely indicate that it never audited Pre-Paid's reports during that period.

public.  But, charitably regarded, the complaint alleges more subtle means and purposes.

The Consolidated Complaint is not limited merely to the improper recording of unearned commission advances as assets.  Plaintiffs also have alleged that Pre-Paid Defendants improperly maintained unrecoverable unearned commission advances as assets.  In other words, even assuming Pre-Paid could properly record unearned commission advances as assets, Plaintiffs allege it was improper for Pre-Paid Defendants to maintain such assets without an adequate reserve and disclosure.  An adequate reserve and disclosure were necessary to inform financial statement users that a material amount of these commission advances were uncollectible.  When Plaintiffs' Consolidated Complaint is viewed in this context, Pre-Paid's disclosures during the class period do not shield Pre-Paid Defendants from liability.  Indeed, by continuing to maintain these commission advances as assets without an adequate reserve and disclosure, Pre-Paid Defendants gave investors the false impression that Pre-Paid could recoup, and in fact was recouping, such unearned commissions.

A comparison of Pre-Paid's 1996, 1998 and 1999 Form 10-K's with its January 25, 2001 Form 8-K and original 2000 Form 10-K, which was filed in April 2001, is most telling. In its earlier filings, Pre-Paid stated that historically it had been successful in collecting half of its unearned commission advances through the use of the charge-back. It also stated its membership persistency rate was approximately 73-74% between 1996 and 1999.[22]  In these

_____

[22] Pre-Paid stated the following concerning its persistency rate in its 1999 Form 10-K:

22

earlier filings, Pre-Paid never wrote off any unearned commission advances and only increased its reserve by $300,000 to $500,000 per year. However, in its 2001 filings (which were filed after the SEC began its investigation and after Pre-Paid's accounting methodology and its ability to recoup unearned commission advances was publically criticized), Pre-Paid no longer claimed historical success in collecting unearned commission advances through the use of the charge-back. Instead, it disclosed for the first time that in addition to the use of the charge-back, it recovered unearned commission advances by docking commissions owed to an associate on prior memberships.[23] Pre-Paid also disclosed for the first time that only 53.37% of membership holders were still paying one year after

---

> One of the major factors affecting [Pre-Paid's] profitability and cash flow is Membership persistency, which represents the ability of [Pre-Paid] to retain a Membership, and therefore receive fees, once it has been written. ... [Pre-Paid's] Membership persistency rate measures the number of Memberships in force at the end of a year as a percentage of the total of (i) Memberships in force at the beginning of such year, plus (ii) new Memberships sold during such year. ... [Pre-Paid's] overall Membership persistency rate could become lower when the Memberships in force include a higher proportion of newer Memberships.

(R. Supp. App. Vol. II at SA-664.) Despite this description, it is unclear exactly how Pre-Paid calculates its membership persistency rate. But, needless to say, because it includes memberships already in force, it appears to tell little of Pre-Paid's ability to retain a membership once it is written.

[23] Pre-Paid also disclosed it has the contractual right to require associates to repay unearned commission advances upon their termination or when it is determined that their earned commission advances are insufficient to repay their unearned advances. However, it conceded it has not exercised this right due to the costs associated with collection efforts and to avoid disrupting its relationship with its associates.

23

purchasing a membership and only 36.97% after two years. These figures stand in stark contrast to Pre-Paid's claimed 73-74% persistency rate. Further, for the first time, Pre-Paid wrote off $7.3 million in unearned commission advances and substantially increased its reserve by approximately $6.5 million. Based on the above, it can be inferred that Pre-Paid's disclosures prior to 2001 were misleading, in particular, that it was recovering its unearned commission advances, when in fact, it was including clearly unrecoverable commission advances as assets.

The foregoing discusses possibly material misstatements or omissions, but that does not end the discussion. The Consolidated Complaint is lacking in terms of Pre-Paid Defendants' motive to commit fraud. As Plaintiffs have alleged, Pre-Paid's Proxy Statement for the year 2001 reveals that Defendants Harp and Pinson received bonuses if Pre-Paid achieved its earnings per share goals.[24] Standing alone, receipt of such bonuses is an insufficient motive as it is a generalized motive shared by all company executives. *See Fleming Cos.*, 264 F.3d at 1269-70 (allegations that a defendant desired to protect his own position with the company, his executive compensation, or the value of his own stock are insufficient motives as they are shared by all company executives) (citing *Novak v. Kasaks*, 997 F.Supp. 425, 430 n.5 (S.D.N.Y. 1998)). That is not to say an executive compensation package is never suspect. The analysis is fact specific and should at least consider whether incentive payments reward good management or simply reward stock performance

---

[24] This proxy statement indicates Harp received a $40,000 bonus in 1998, 1999 and 2000 and Pinson received a $9,000 bonus in 2000 and a $6,000 bonus in 1999 and 1998.

24

irrespective of the company's financial health.

With regard to the Associate Investment Stock Club Purchase Plan, there is no indication in the record that Pre-Paid obtained any of Defendant Stonecipher's personal stock holdings to fund this plan. However, Pre-Paid Defendants have also not adequately refuted this allegation.[25]

Plaintiffs' allegations concerning the outside directors are more compelling, in particular, their allegations regarding Defendant Savula. According to the record, Savula sold 15,000 shares on October 23, 2000, at approximately $38 per share. He also sold another 3,000 shares on November 6, 2000, at $46.5 a share, which was a mere $2.25 less than the class period high. These sales amounted to 45% of Savula's total holdings and earned him over $700,000. Meanwhile, he purchased no shares during the class period. As to Defendant Grunebaum, he sold 19,800 shares and bought 16,500 shares during the class period. However, his sales were all at $30-$34 a share, while all of his purchases were made pursuant to stock options which allowed him to purchase shares at $8 to $16 per share. Nevertheless, his stock activity during this time period appears consistent with his stock activity prior to the class period. He appears to routinely acquire stock through the exercise

---

[25] Pre-Paid Defendants assert that the fact Defendant Stonecipher did not sell any shares during the class period demonstrates that he did not sell any shares to this plan. However, as stated below, Pre-Paid Defendants' assertion that Stonecipher did not sell any shares during the class period is belied by the record. Therefore, without further evidence, we decline to give credence to Pre-Paid Defendants' contention that Defendant Stonecipher did not sell any of his shares to the plan.

25

of stock options and sell it at a profit.[26]  Thus, Grunebaum's trading during the class period

was not "dramatically out of line" with his prior trading practices.[27]  *See In re Apple*

*Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (concluding insider trading may

support a finding of bad faith if such trading is conducted in amounts "dramatically out of

line with prior trading practices at times calculated to maximize personal benefit from

undisclosed inside information").

In addition to arguing that Plaintiffs' alleged motives are insufficient, Pre-Paid

Defendants argue other evidence demonstrates their complete lack of motive to commit

fraud.  First, they assert Pre-Paid purchased millions of dollars of its own stock, thereby

making Pre-Paid the biggest victim of its own alleged fraud.  Second, they claim Defendants

Stonecipher, Harp and Pinson did not sell any stock during the class period and in fact

purchased stock, with Harp borrowing a large sum of money to do so.  Pre-Paid Defendants

argue Plaintiffs' assertion that they fraudulently inflated the price of Pre-Paid's stock defies

economic reason, as it makes no sense for Pre-Paid and these individual defendants to

purchase stock they knew to be artificially inflated.

---

[26] For instance, in June and July of 1996, he exercised his stock options and purchased 22,500 shares at approximately $1-$2 a share.  In those same months, he sold 9,000 shares at approximately $20-$24 per share.

[27] Based on our limited record, Grunebaum's "prior trading practices" are confined to the period June 1996 through February 1999.  However, we doubt the value of comparing pre- and post- class period trading in this case.  Correlative trading behavior is informative only if the comparitor occurred in an untainted time frame.  Here, Pre-Paid was accounting for unearned commission advances as assets for at least three years prior to the class period.

Pre-Paid Defendants correctly assert that Defendants Stonecipher, Harp and Pinson bought shares during the class period. The record reveals Stonecipher, Harp and Pinson purchased 10,000, 47,000 and 3,300 shares, respectively. However, Pre-Paid Defendants incorrectly state that none of these individuals sold shares during the class period. Indeed, Stonecipher sold 28,400 shares, Harp sold 14,284 shares and Pinson sold 600 shares. While Pinson's sales represented only a small portion of her total shares at that time (approximately 35,000 shares), she sold the 600 shares at approximately $33 a share. Although she purchased 3,300 shares during the class period, she did so one month before the class period ended and paid only approximately $15 per share. Moreover, in 1998, she acquired 15,000 shares, paying a mere $.375 per share. Therefore, her stock sales during the class period were not necessarily consistent with her pre-class period sales.

As to Defendant Harp, although he purchased 47,000 shares during the class period, he did so by exercising options, paying $9.25 per share. Meanwhile, he sold 14,284 shares at approximately $26.00 a share.[28] While Defendant Stonecipher sold only a small

_____

[28] Pre-Paid Defendants state Harp borrowed money to purchase these shares. They point to a promissory note attached to Pre-Paid's original 2000 Form 10-K. Although this note shows Harp borrowed approximately $330,000 from Pre-Paid, nothing in this note indicates that he borrowed this money to purchase stock. This is the second time Pre-Paid Defendants have asked us to infer something the record does not support. They also stated the SEC performed a review of Pre-Paid's accounting in 1994 and while it required Pre-Paid to remove deferred acquisition costs as assets, it left intact Pre-Paid's recording of commission advances (referred to in 1994 as "Associates' balances") as assets. (Supp. App. Vol. I at SA-291.) While Pre-Paid did change its accounting of deferred acquisition costs, there is no indication in the record that the SEC required this change. In fact, the record expressly states Pre-Paid changed its accounting of deferred acquisition costs to reflect the changes in its business to

percentage of his one million shares during the class period, he sold even a smaller portion (18,000 shares) prior to the class period. Of the shares he sold during the class period, 4,500 shares were sold at $30.25 a share and 100 shares at $26.88.[29] As with Defendant Pinson, Defendant Stonecipher's one purchase during the class period came one month before the class period ended, paying close to $18 per share. And while he purchased 10,000 shares during the class period, before the class period he purchased over 100,000 shares at roughly $2-$3 a share. Based on the above, while these defendants purchased shares during the class period, superficially defying economic reason, they did so at low prices, which might change the equation. Defendants Pinson and Stonecipher made stock purchases during the class period but at substantially lower volume than their purchasing activity prior to the class period. Nevertheless, none of them appear to have dumped their shares.

More compelling are Pre-Paid Defendants' arguments concerning Pre-Paid's repurchase of its own stock. The record shows that on April 6, 1999, Pre-Paid announced a stock repurchase program authorizing management to reacquire up to 500,000 shares of its own stock. During subsequent board meetings, Pre-Paid's board of directors increased such authorization to 3,000,000 shares.[30] As of March 31, 2001, Pre-Paid had repurchased

_____

predominately closed-panel memberships.

[29] The record does not reveal the price for which he acquired the remaining 23,800 shares he sold during the class period.

[30] Pre-Paid's Amended Form 10-K for year ending December 31, 2000, which is dated February 1, 2002, states the board of directors increased the authorization to 4,000,000 shares.

28

2,456,991 shares under this program for a total consideration of $56.4 million, an average price of $22.94 per share.[31] There is no allegation that Pre-Paid later sold these shares for a profit. The district court thought it "patently absurd" and contrary to economic sense for a corporation to artificially inflate the price of its stock only to then purchase the stock at such inflated prices. (R. App. Vol. III at A-741.) Plaintiffs disagree, asserting Pre-Paid's repurchase of its own stock at artificially inflated prices is only absurd if Pre-Paid expected to get caught. Moreover, they assert there may have been other reasons for Pre-Paid's repurchase program including to aid in the recruitment of new associates, to avoid the discontentment of its 200,000 member sales force who were investing monthly in Pre-Paid stock via the Associate Investment Stock Club Purchase Plan, or to more easily manipulate

---

[31] Pre-Paid Defendants assert in their brief that Pre-Paid bought $62.5 million worth of shares. They cite to the district court's March 5, 2002 order. However, in its order, the district court refers to the $56.4 million figure. It is only after reviewing Pre-Paid Defendants' motion to dismiss in the district court that we see how they arrived at this figure. According to their original Form 10-K for 2000 and their Form 10-Q for the quarterly period ending March 31, 2001, Pre-Paid repurchased $29.4 million worth of shares in 1999, $17.3 million worth of shares in 2000, and $12.8 million worth of shares in the first quarter of 2001, for a total of $59.5 million. According to its May 16, 2001 press release, Pre-Paid purchased another $3 million worth of shares in the second quarter of 2001 for a total of $62.5 million worth of shares. We derived the $56.4 million figure from Pre-Paid's Form 10-Q for the quarterly period ending March 31, 2001, which of course did not include the $3 million worth of shares purchased in the second quarter of 2001. However, there still remains a discrepancy of $3.1 million ($62.5 - ($56.4 + $3)). Apparently, not all of the shares repurchased in 1999 were the result of the April 1999 stock repurchase program. While this difference is not material, we point it out to note that once again Pre-Paid Defendants' record citation in their brief does not support the proposition for which it is cited.

29

the stock.[32]  They claim without discovery there is no way to know Pre-Paid Defendants' true motivation.  However, none of these arguments appear as allegations in the Consolidated Complaint.

Based on the above, we conclude Plaintiffs' Consolidated Complaint insufficiently pleads scienter.  However, unlike the district court, we do not believe Plaintiffs' fraud theory is "patently absurd."  The Consolidated Complaint raises some serious "red flags" concerning Pre-Paid Defendants' long term recording of unrecoverable unearned commission advances as assets and the credibility of their pre-2001 SEC disclosures. Nevertheless, it is lacking in allegations demonstrating Pre-Paid Defendants' alleged fraud was economically logical in light of Pre-Paid's repurchase of its own stock at allegedly inflated prices.  It also fails to adequately allege Pre-Paid's GAAP violation was the result of an intent to mislead investors.  Therefore, dismissal was appropriate.  We now turn to whether Plaintiffs should have been provided an opportunity to amend their complaint.

2. Amendment of Complaint

In their opposition to Pre-Paid Defendants' motion to dismiss, Plaintiffs obliquely requested leave to amend the Consolidated Complaint in the event the court determined it was deficient.  In its order granting Pre-Paid Defendants' and Deloitte's motions to dismiss, the district court did not expressly deny, or even acknowledge, Plaintiffs' request for leave

---

[32] We also note Pre-Paid's directors and executives, several of them named as defendants, could have initiated the stock repurchase program in order to increase Pre-Paid's stock price by decreasing the supply of its stock.  In other words, these directors and executives could have sacrificed the company for their own personal gain.

to amend. However, in its conclusion, the court stated: "Because it does not appear that any amendment would be successful in overcoming the pleading deficiencies, this action is dismissed with prejudice, and a judgment will enter." (R. App. Vol. III at A-749.)

Plaintiffs argue the district court abused its discretion in denying them leave to amend. They assert the district court denied their request for leave to amend because amendment would be futile. However, they contend the district court provided no explanation as to why amendment would be futile. Plaintiffs also argue that under the circumstances of this case leave to amend should have been "freely given" because they made a timely request for amendment, they were not previously given any opportunity to amend[33] and Pre-Paid Defendants would not be prejudiced. Fed. R. Civ. P. 15(a). This is especially true, they assert, in a securities fraud action, where the pleading requirements are so rigorous.

Although Plaintiffs contend the district court erred in denying their request for leave to amend, no such request was properly before the court. "[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it." *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186-87 (10th Cir. 1999). This notice requirement assures that we do not "require district courts to engage in independent research or read the minds of litigants to determine if

---

[33] While Plaintiffs' complaint was titled "Consolidated Amended Complaint," it was in fact the first complaint they filed as a prospective class. (R. App. Vol. I at A-17.)

31

information justifying an amendment exists." *Id.* at 1187 (quotations omitted). Here, Plaintiffs made only a cursory request for leave to amend at the conclusion of their response to Pre-Paid Defendants' motion to dismiss. Not only did they not provide a proposed amended complaint, they also failed to proffer what additional evidence they would plead or how such additional evidence would remedy the Consolidated Complaint's deficiencies. They merely argued in a single paragraph that it is improper to deny leave to amend (especially in cases dismissed for failure to adequately allege fraud) when the plaintiff does not act in bad faith and defendant would not be prejudiced. In essence, they placed the district court in the untenable position of making their case for them. Such a request is insufficient.

*Calderon* is instructive. There, the plaintiff concluded her memorandum in opposition to the defendants' motion to dismiss with a single sentence requesting leave to amend her complaint to cure any defects. *Calderon*, 181 F.3d at 1185. The district court did not address the plaintiff's request and dismissed the case with prejudice. *Id.* at 1183, 1185. On appeal, the plaintiff argued the district court abused its discretion in failing to grant her leave to amend. *Id.* at 1185. We rejected the plaintiff's argument, concluding the plaintiff's "single sentence, lacking a statement for the grounds for amendment and dangling at the end of her memorandum, did not rise to the level of a motion for leave to amend. Because a motion for leave to amend was never properly before it, the district court did not abuse its discretion in failing to address [the plaintiff's] request for leave to cure deficiencies in her pleadings." *Id.* at 1187. *See also Glenn v. First Nat'l Bank in Grand Junction*, 868

32

F.2d 368, 370 (10th Cir. 1989) (concluding that the district court did not err in failing to address the plaintiffs' request for leave to amend, which was made in their response to the defendants' motion to dismiss, because the request did not rise to the status of a motion and failed to set forth any grounds for the request). The same is true here.

We also note that even after the district court granted Pre-Paid Defendants' motion to dismiss and outlined the alleged deficiencies of the Consolidated Complaint, Plaintiffs failed to request leave to amend. In their Rule 60(b) motion, Plaintiffs argued the district court misunderstood the facts and erred on the merits. However, they never suggested amendment of the complaint. On appeal, Plaintiffs continue to fail to provide any explanation as to how amendment would cure the deficiencies of the Consolidated Complaint. They merely argue: "Indeed, as numerous additional facts (including, significantly, Pre-Paid's actual restatement of financial results) came to light following Plaintiffs' filing of the [Consolidated] Complaint, and were not therefore part of the record, the District Court was in no position to conclude that such subsequently discovered information would necessarily fail to cure the perceived deficiencies."[34] (Appellants' Opening Br. at 58-59.) Yet, Plaintiffs never proffered this additional information to the district court and to this day, they do not indicate what information they would include in an

_____

[34] Although Pre-Paid's restated financial statements were filed after the Consolidated Complaint, the Consolidated Complaint contained Pre-Paid's estimates for the restatement, which were similar in magnitude to the actual restated financial statements. **[App. Vol. III at A-759]** Additionally, the district court was aware of the magnitude of Pre-Paid's restated financial statements when it ruled on Plaintiffs' Rule 60(b) motion. **[Id. at A-919]**

amended complaint to satisfy the scienter requirement.

Plaintiffs failed to adequately request amendment and to support that request. Consequently, the district court did not err in dismissing this case without leave to amend. Because our conclusion that the district court properly dismissed this case with prejudice for failure to adequately plead scienter disposes of this appeal, we need not address the timeliness of Plaintiffs' complaint or the truth-on-the-market doctrine.

**AFFIRMED.**

Entered for the Court

Terrence L. O'Brien
Circuit Judge